IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Luckey Farmers, Inc.,                                      Case No. 23-cv-01091

        Plaintiff,

    v.                                                                    **ORDER**

Tim Vergote,

        Defendant.

_____/

Tim Vergote,

        Counterclaim Plaintiff/
        Third-Party Plaintiff

v.

Luckey Farms, Inc.,

        Counterclaim Defendant,

and

Ida Farmers Cooperative Co.,

        Third-Party Defendant.

_____/

These cases involve the production, storage, and marketing of grain.[1]

    This Opinion and Order applies to both *Luckey Farmers v. Fergus Farms, LLC*, N.D. Ohio

Case No. 23-cv-01207 ("*Fergus*") and *Luckey Farmers v. Vergote*, N.D. Ohio Case No. 23-cv-

---

[1] "Grain" is a generic term that can relate to crops such as corn and soybeans. In this case, the farmers produce both corn and soybeans.

0191 ("*Vergote*"). The issues before me in both cases are, in all material respects, identical. Therefore, for judicial efficiency, I address both cases at the same time.

When Plaintiff Luckey Farmers, Inc. ("Luckey") initially filed its complaints in the Court of Common Pleas in Sandusky County, Ohio, it alleged that Defendants Fergus Farms, LLC, ("Fergus") and Tim Vergote ("Vergote") (together referred to as the "Farmers") had breached the terms of their contractual relationships with Luckey. (*See Fergus*, Doc. 1; *see Vergote*, Doc. 1).

The Farmers removed the cases to this Court under 28 U.S.C. § 1441(b). (*Fergus*, *id*; *Vergote*, *id*.). [2]

The removing party bears the burden of establishing federal subject matter jurisdiction at the time of removal. *Ahearn v. Charter Twp. of Bloomfield*, 100 F.3d 451, 453–54 (6th Cir. 1994); *and see* 28 U.S.C. §§ 1441, 1446. Federal courts are courts of limited jurisdiction, and therefore any doubts regarding federal jurisdiction should be construed in favor of remanding the case to state court. *Id*. (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941)).

When they removed this case from Sandusky County court, the Farmers alleged:

> Removal is proper because there is complete diversity between the parties. 28 U.S.C. § 1332(a); Plaintiff, as alleged in the Complaint, is a citizen of Ohio. Defendant is a Michigan Limited Liability Company and has its principal place of

---

[2] In the same general time period, Luckey filed four other lawsuits against various grain farmers alleging similar claims. The defendants removed those cases to this District Court, and similarly brought counter-claims against Luckey and third-party claims against Ida Farmers Cooperative Company, another grain elevator. *See*, *Luckey Farmers v. Histed Farms, LLC.*, No. 23-cv-00926 ("*Histed*"), *Luckey Farmers v. Maple Row Farms, LLC*, No. 23-cv-00927 ("*Maple Row*"), *Luckey Farmers v. R&L Farm and Freight, LLC*, No. 23-cv-1088 ("*R&L*"), and *Luckey Farmers v. Dzurka Bros, LLC*, No. 23-cv-01293 ("*Dzurka*"). *Histed*, *Maple Row*, and *Dzurka* are assigned to my colleague, Hon. Jeffrey J. Helmick. *R&L* is assigned to my colleague, Hon. James R. Knepp II. Motions to dismiss are pending in those four cases.

Neither Luckey nor Ida have raised any issues regarding claim or issue preclusion. I will not address either topic here.

business in the state of Michigan. Additionally, the amount in controversy exceeds $75,000, excluding interest and costs. 28 U.S.C. § 1332(a). For this purpose, the first and only count of the Complaint alleges damages of $239,366.95.

(*Fergus*, Doc. 1, PageID. 5; and see Vergote, Doc. 1, PageID. 4 (alleging identical arguments as Fergus, except that the amount in controversy alleged in Vergote is $338,276.10.)).

To plead diversity of citizenship, the action must be between citizens of different states. *See* 28 U.S.C. § 1332(a)(1). "[A] limited liability company has the citizenship of each of its members." *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009). Thus, "[w]hen diversity jurisdiction is invoked in a case in which a limited liability company is a party, the court needs to know the citizenship of each member of the company. And because a member of a limited liability company may itself have multiple members—and thus may itself have multiple citizenships—the federal court needs to know the citizenship of each 'sub-member' as well." *Id*.

The Farmers' citizenship allegations are inadequate to demonstrate that diversity existed at the time of removal because they fail to include their LLC members or their citizenship.

As to Luckey's citizenship, the Farmers rely on Luckey's complaint, where Luckey states, "Luckey Farmers, Inc. is an Ohio cooperative association under Chapter 1729 of the Ohio Revised Code, having its principal place of business located at 1200 West Main Street, Woodville, Ohio, 43469." (*Fergus*, Doc. 1-1, PgID. 9; *Vergote*, Doc. 1-1 PgID. 8).

Cooperatives can be formed as LLC or corporations. The citizenship of a cooperative that was formed as an LLC is based on the citizenship of each of its members. *See Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009). A cooperative that is formed as a corporation is considered a citizen of the state in which it has been incorporated and the state where it has its principal place of business. *See, e.g., Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1182–1183 (9th Cir. 2004) (stating that, for a nonprofit cooperative corporation, citizenship is determined by

the citizenship of the corporation). The Farmers have not provided me with enough—indeed, any—information regarding Luckey's formation to determine its citizenship.

Accordingly, the Farmers did not meet their burden to demonstrate that diversity existed between the parties at the time of removal.

However, the issue of whether diversity exists became moot when the Farmers filed their counterclaim against Luckey and brought third-party claims against Ida Farmers' Cooperative Company ("Ida") alleging that I have federal question jurisdiction. (*Fergus*, Doc. 4, PageID. 65; *Vergote*, Doc. 3, PageID. 31).

Federal question jurisdiction under 28 U.S.C. § 1331 is the "well-worn thoroughfare [that] admits litigants whose causes of action are created by federal law, that is, where federal law provides a right to relief." *Eastman v. Marine Mechanical Corp.*, 438 F.3d 544, 550 (6th Cir. 2006). The citizenship of the parties does not matter if I have federal question jurisdiction under 28 U.S.C. § 1331.

The Farmers' claims against the Grain Elevators allege, *inter alia*, federal claims under the Commodities Exchange Act (the "Act") 7 U.S.C. § 1 *et seq.* and various state-law claims. (*Fergus*, *id.*; *Vergote, id.*). The Farmers argue that the contracts at issue are "futures contracts," which the Act governs. *Id.*

Pending are the Grain Elevators' motions to dismiss the Farmers' claims. (*Fergus*, Docs. 13, 24; *Vergote*, Docs. 9, 24). The Grain Elevators argue, *inter alia*, that the Act does not govern the contracts at issue in these cases because the contracts are not futures contracts.

The Farmers oppose the motions. They contend that the contracts in these cases are indeed futures contracts under the Act. (*Fergus*, Docs. 22, 29; *Vergote*, Docs. 15, 25). The Grain Elevators have filed replies. (*Fergus*, Docs. 25, 30; *Vergote*, Docs. 16, 26).

Presently at issue is whether I have jurisdiction over this case; that is, whether the Act applies to the contracts.

For the reasons that follow, I find that the contracts are not futures contracts subject to the Act. Therefore, the Grain Elevators' motions to dismiss are granted as to the federal claims.

This leaves only state-law claims between the parties. Under 28 U.S.C. § 1367, I need not exercise supplemental jurisdiction over state-law claims where I have dismissed all claims over which I have federal question jurisdiction. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-- … (3) the district court has dismissed all claims over which it has original jurisdiction[.]").[3]

I see no basis on which to exercise supplemental jurisdiction over the state-law claims. Because the Farmers have not carried their burden to show that the LLCs and cooperatives are fully diverse, and because I decline to exercise supplemental jurisdiction, I remand the cases to the Common Pleas Court of Sandusky County, Ohio for all further proceedings.

## Background

The Farmers are in the business of growing and selling grains, such as corn and soybeans, to Grain Elevators, such as Ida and Luckey. (*Fergus*, Doc. 4, PageID. 71–72; *Vergote*, Doc. 3, PageID. 88–89). "Grain elevators" purchase grain directly from grain farms and farmers. They

---

[3] Even if the Farmers had established that I had diversity jurisdiction at the time of removal, which they did not do, the Rules prohibit me from exercising supplemental jurisdiction over the Farmers' claims against Ida because Ida is third-party brought into a lawsuit under Rule 14 and the Farmers have failed to establish Ida's corporate citizenship. *See* 28 U.S.C. § 1367(b) ("In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, […] of the Federal Rules of Civil Procedure, […], when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332").

store it and then sell it on to customers in the grain supply chain. (*See Fergus*, Doc. 4, PageID. 67, 72).

Sometimes, largely due to market conditions, there is a delay between the time the Grain Elevators take delivery of the grain from the farmer and the sale down the chain to the customer. (*Fergus, id.*; *Vergote, id.*). In such times, the Grain Elevator stores the grain until its sale to the customer. (*Fergus, id.*; *Vergote, id.*).

Participants in the grain industry face risks; in particular, risks of price volatility due to market conditions. (*Fergus, id.* at PageID. 72; *Vergote*, *id*. at PageID. 88). Both farmers and grain elevators are "at the mercy of the weather and other domestic and global supply and demand factors." (*Fergus*, Doc. 25, PageID. 248; *Vergote*, Doc. 16, PageID. 199). Those factors, weather and grain prices, are equally and mutually uncontrollable and unpredictable.

The Farmers explain that one way that industry members manage these risks is to employ several types of grain contracts with different pricing components. (*Fergus*, Doc. 4, PageID. 72–75; *Vergote*, Doc. 3, PageID. 88–92). Some contracts contain a fixed price, volume, and delivery date at the time of contracting. (*Fergus, id.*; *Vergote, id.*). For example, in a "Fixed Price" contract, the farmer and grain elevator "agree on the quantity, quality, delivery terms and the price for grain to be delivered at a fixed time in the future." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 319 (6th Cir. 1998).

Other types of contracts leave some of these components variable and subject to later market developments. (*Fergus, id.*; *Vergote, id.*). One type of variable contract, an Accumulator Contract, is at issue here.

The Accumulator Contracts at issue here "utilized an 'Accumulator' contract pricing mechanism that could cause the quantity of bushels to be delivered" to double "if certain futures

reference price levels were reached." (*Fergus*, Doc. 13-1, PageID. 132; *Vergote*, Doc. 9-1, PageID. 148). In other words, if a CBOT-established price reached an agreed-upon threshold, then the quantity of bushels for the Farmers to deliver under the contract would double. (*Fergus*, Doc. 4, PageID. 74; *Vergote*, Doc. 3, PageID. 90).

Neither party disputes that here, the CBOT-established price reached the agreed-upon threshold under all of the contracts at issue. (*Fergus*, *id*., PageID. 66–71; *Vergote*, *id*., PageID. 82–88). Thus, the contracts required the Farmers to deliver double the quantities of grains under their contracts with the Grain Elevators. (*Fergus, id*.; *Vergote, id*.). The Farmers were unable to deliver these quantities upon their original delivery dates. (*Fergus, id*.; *Vergote, id*.).

The parties elected to "roll out" the delivery dates for some or all of these contracts to later dates through contract amendments. (*Fergus, id*.; *Vergote, id*.). However, by the time the last delivery date period expired, the Farmers failed to make full delivery of the grains under the contracts. (*Fergus*, Doc. 1-1, PageID. 10–12; *Vergote*, Doc. 1-1, PageID. 9–13). Luckey cancelled the contracts, calculated its market losses, and invoiced the Farmers for those amounts. (*Fergus, id*.; *Vergote, id*.).

Luckey's complaints against the Farmers in both cases allege breaches of contract and promissory note claims, which are governed by state law. (*Fergus, id*., PageID. 12–13; *Vergote, id*., PageID. 13–14).

The Farmers contend that these are not merely straightforward breach of contract cases. (*See e.g., Fergus*, Doc. 4, PageID. 66–100). The Farmers assert eight counts against the Grain Elevators. The first three counts are federal claims: (1) fraud by misrepresentation or omission of material facts in connection with the solicitation, maintenance, or execution of commodities futures transactions, in violation of the Act, 7 U.S.C. § 6c(a); (2) violation of 7 U.S.C. § 6c(a),

7

through the Grain Elevators' "unlawful engagement in illegal off-exchange fictitious sales of grain;" and (3) violation of 7 U.S.C. §§ 6m and 6o, when the Grain Elevators allegedly committed "fraud by a Commodities Trade Advisor employing a device, scheme or artifice in the course of a transaction, practice, or course of business." (*Fergus,* Doc. 4, PageID. 100–110; *Vergote*, Doc. 3, PageID. 117–126).

The Farmers' remaining five counts are state-law claims. I need not recite them in light of my conclusion that the contracts are not futures contracts under the Act.

### Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), I decide whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). This statement must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678.

In this case, Federal Rule of Civil Procedure 10(c) authorizes me to consider documents attached to the pleadings. In doing so, I am not converting this motion to dismiss into one for summary judgment. *See Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–

36 (6th Cir. 2007). Additionally, "[w]here a written instrument attached to a pleading contradicts allegations in the pleading, a court must credit the instrument, rather than the allegations." *Creelgroup, Inc. v. NGS Am., Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013) (internal quotations omitted).

## Discussion

### 1. Applicability of Federal Law

As discussed, the Farmers' first three counts against the Grain Elevators are based on their contention that the contracts at issue, (herein referred to as the "Accumulator Contracts") are futures contracts under the Act. The threshold question I must resolve therefore is whether, as contended by the Farmers, the Accumulator Contracts are futures contracts or whether they are "Cash Forward" contracts, which the Act does not govern.

In *Andersons, supra*, 166 F.3d at 318, the Sixth Circuit explained that, under the Act, futures contracts are "contracts of sale of a commodity for future delivery." *Id*. (citing 7 U.S.C. § 2). The term "future delivery" under the Act explicitly excludes "any sale of any cash commodity for deferred shipment or delivery." *Id.* (citing 7 U.S.C. § 1a(11)). A contract involving the sale of a cash commodity for deferred shipment or delivery is instead a "Cash Forward" contract; not a futures contract. *Id*.

The Act exempts Cash Forward contracts so that parties "who contemplate physical transfer of [a] commodity" can enter into a contract that "(1) defer[s] shipment but guarantee[s] to sellers that they will have buyers and *visa versa*, and (2) reduce[s] the risk of price fluctuations, without subjecting the parties to burdensome regulations." *Id*.

The Sixth Circuit explained: "in determining whether a particular commodities contract falls within the cash forward exemption, courts must focus on whether there is a legitimate

expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Id.*

In *Andersons,* the Sixth Circuit analyzed whether certain grain contracts between a farmer and a grain elevator, styled as "Hedge-to-Arrive" (or "HTA") contracts, were futures contracts subject to the Act, or whether they fell under the Cash Forward exemption. *Id.* at 318. The Court found that the HTA contracts fell under the Cash Forward exemption. Therefore, they were not subject to the Act.

The Court set forth a seven-factor test to determine whether the Cash Forward exemption applies. The seven factors are whether:

> (1) the grain elevator […] entered into these contracts only with farmers and producers of grain—not with speculators from the general public; (2) each plaintiff was a farmer in the business of growing grain and had the ability to make delivery on the contracts; (3) [the defendant] was in the business of obtaining grain under contracts for resale and relied on actual delivery of that grain to carry out its business; (4) [the defendant] had the capacity to take delivery of the grain subject to the HTAs; (5) on their faces, the contracts were clearly grain marketing instruments, tools to accomplish the actual delivery of grain in exchange for money; (6) it was undisputed that delivery and payment routinely occurred between the parties in past dealings; and (7) the plaintiffs received cash payment on the contracts only upon delivery of the actual commodity.

*Id.* at 320 (citing *In re Grain Land Cooperative*, 978 F. Supp. 1267, 1273–74 (D. Minn.1997)).[4]

---

[4] Later, in 2008, the Sixth Circuit developed a slightly modified test for determining whether a contract is a futures or forward contract in *Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309 (6th Cir. 2008). This test puts less emphasis on the "legitimate expectation of delivery" factor, without specifically overruling it.

Courts in this Circuit continue to apply the *Andersons* factors to tangible commodities contracts, such as grain contracts, and apply *Erskine* to contracts for intangible commodities. Here, there is no dispute that the contracts at issue involve tangible commodities, specifically, grains. Therefore, the *Andersons* factors apply here.

The *Andersons* Court stated: "these characteristics exemplify the types of transactions that Congress intended to exclude from the [Act]." *Id*.

In *Andersons*, the contracts at issue exhibited all seven characteristics of a Cash Forward contract. *Id*. The Court explained:

> There is no evidence that The Andersons entered into these HTA contracts with anyone other than farmers/grain producers. Although Horton Farms as a corporate entity did not itself grow the corn, it was in the business of obtaining it on a regular basis from Rodney Horton and his son, Robert Horton, and had the ability to make delivery on the contracts. Similarly, The Andersons was in the business of obtaining corn under contracts for resale, relied on the corn's actual delivery to carry on its business, and had the capacity to take delivery of the corn subject to the HTA contracts. On their faces, the HTA contracts contemplated the actual and physical delivery of corn in exchange for money, notwithstanding that the price to be paid consisted of an agreed-upon variable that was to be finalized at a future time. Moreover, Horton Farms was to receive payment only after it fulfilled all of the contract terms, which included actual delivery. And finally, until the present dispute arose, the parties had a several-year history of delivery of corn and payment therefor under similar contracts.

*Id*. Accordingly, the HTA contracts in *Andersons* were exempt from the Act.

### a.  The Act Does Not Automatically Apply to Accumulator Contracts

The Farmers argue that, before I can even reach the seven-factor *Andersons* analysis, I should outright reject the proposition that the contracts here could possibly be exempt from the Act. (*Fergus*, Doc. 22-1, PageID. 190 –192; *Vergote*, Doc. 15-1, PageID. 185 –188). They argue that the presence of accumulator provisions in these contracts inevitably means that these contracts could never be exempt. Indeed, the Farmers argue that any similarities between the contracts here and the HTA contracts in the *Andersons* is "facetious, if not almost laughable." (*Fergus*, *id.*, PageID. 190; *Vergote*, *id*., PageID. 185). These contentions are unconvincing.

The Farmers' argue that the nature of an accumulator provision makes these Accumulator Contracts so unique that they cannot be compared to other commodities contracts. This misses the

point. The focus of the futures-or-Cash-Forward-contract analysis in *Anderson*s "is on whether the contracts in question contemplated actual, physical delivery of the commodity." *Andersons*, *supra*, 166 F.3d at 319–20 (internal citations omitted).

No one disputes that the contracts contain a provision that provides for two options for the final quantity of deliverable grain. This possibility for variability in the quantity does not negate the fact that, in the end, delivery of grain is the core of the parties' agreement here. Accordingly, I will analyze the Andersons factors.

### b.  The *Andersons* Factors

Applying *Andersons*, I conclude that the Accumulator Contracts are Cash Forward Contracts and are therefore exempt from the Act.

First, there is no dispute that the Accumulator Contracts are between farmers and grain producers only.

Second, Fergus and Vergote are in the business of growing the grains that are the subject of the Accumulator Contracts. Neither Farmer contends they are not in the business of growing the grains they had contracted to deliver.

Third, the Grain Elevators understandably assert that they needed delivery of grains to carry out their businesses.

Forth, no party disputes that the Grain Elevators had the capacity to take delivery of the grain from the Farmers.

Fifth, the face of the Accumulator Contracts clearly indicate they are "grain marketing instruments." *Andersons*, *supra*, 166 F.3d at 319. In other words, the contracts are the parties' "tools to accomplish the actual delivery of grain in exchange for money." *Id*.

Sixth, it is undisputed that delivery and payment routinely occurred between the parties under the Accumulator Contracts.

Seventh, the Farmers received payment when they delivered the grain to the Grain Elevators.

In their arguments that several of these factors are unmet, the Farmers repeat that the *quantity* of grains under the accumulator provisions were so great that they were impossible for the Farmers to meet. (*Fergus*, Doc. 4, PageID. 93–95; *Vergote*, Doc. 3, PageID. 110–112). These impossible quantities, they argue, undermine the enforceability of the Accumulator Contracts and accordingly, these contracts were never truly intended as commodities contracts. (*Fergus, id.*; *Vergote, id.*). I reject these arguments.

First, these arguments relate more to the Farmers' state-law claims against the Grain Elevators. I leave those matters to the Ohio courts on remand.

Second, as discussed in the prior section, the mere fact that the contracts contain a provision that provides for two options in the final quantity of deliverable grain does not change the bottom line. *See Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 579 (9th Cir. 1982) ("Except for price, all the futures contracts for a specified commodity are *identical in quantity* and other terms.") (emphasis added).

Under the contracts, the Farmers produced, and the Grain Elevators purchased, grains. The Grain Elevators had capacity and the expectation of receiving the delivered grain, whether the amount was "x" or "2x."

Thus, all seven *Andersons* factors mandate the finding that the Accumulator Contracts are Cash Forward contracts. They are therefore exempt from the Act.

13

### c.  Additional Characteristics of Act Exemption Are Present

In addition to the seven *Andersons* factors, there are other provisions in the Accumulator Contracts that support my finding that they are Cash Forward, rather than futures, contracts. Even if the Accumulator Contracts did not fit so squarely within all seven *Andersons* factors, these express acknowledgements about the nature of the contracts would compel me to find that the contracts were not futures contracts.

For example, the Accumulator Contracts unambiguously state that they are not intended to be futures contracts. They state:

> No Futures or Options Contract. By entering into the Contract and this Addendum, Seller does not open a futures or an option account to enter into a futures or options position for the Seller with Buyer or any third party. The Contract and this Addendum employ futures or options contracts solely as a commodity pricing mechanism. The Contract and this Addendum do not constitute a futures or options contract.

(*See, e.g.*, *Fergus*, Doc. 1-1, PageID.  21; *Vergote*, Doc. 1-1, PageID. 21).

Next, the Accumulator Contracts contain a clear integration clause. This clause negates the possibility that there was an enforceable side-agreement or secondary understanding of its terms beyond what is plainly written, as the Farmers contend. The contracts state:

> the Contract, this Addendum, any enrollment form or other documentation required by Buyer, and any documentation terms, conditions, or other requirements established by AgriVisor from time to time related to the Program set forth the entire understanding and agreement of the parties related to the transactions contemplated in the Contract and this Addendum.

(*Fergus*, *id*. at PageID.  22; *Vergote*, *id*., PageID. 22).

Accordingly, these terms also weigh in favor of my finding that these are Cash Forward contracts and exempt from the Act.

14

#### d. Infinite Rolling

The Farmers' argue that the Accumulator Contracts lacked a legitimate expectation of actual delivery because delivery dates could be infinitely rolled. (*Fergus*, Doc. 4, PageID. 82–83; *Vergote*, Doc. 3, PageID. 98–100). Therefore, the Farmers' argue, this characteristic should persuade me to find that the Accumulator Contracts are indeed futures contracts, subject to the Act. I disagree.

The Farmers' argument is flawed. The *Andersons* Court rejected the argument that a contract containing an option to roll delivery dates made the contracts potentially "infinite." *Andersons*, *supra*, 166 F.3d at 321. The Court continued, "the fact that speculative futures contracts are often 'rolled' does not foreclose the use of such term to move forward an actual delivery date in contracts that are not futures contracts." *Id*.

The Court also stated, "[t]hat some of the contracts in question were in fact rolled forward, however, does not mean that they may be rolled forward 'infinitely.'" *Id*. This is especially true where, as here, the very terms of the contract state an actual delivery period. *Andersons*, therefore, forecloses the Farmers' arguments regarding infinite rolling.

In *Andersons*, the Court also rejected the farmers' attempt to introduce parol evidence supporting an oral understanding between the farmers and the grain elevator that the contracts did not contemplate actual delivery because they could be rolled infinitely. This evidence contradicted the plain language of the contract itself. The contract "explicitly provide[d] for actual, tangible delivery." *Id.*

Similarly here, in their complaint alleging infinite rolling, the Farmers cite parol evidence. They cite testimony from Alan Peters, a former Ida employee who later became a Luckey

15

employee. Peters' testimony is from a different case in Lenawee County, Michigan where he testified:

> Q: As I understand it, what you're telling me is that someone could roll ahead those contracts indefinitely?
> A: Yes.
> Q: So according, what your testimony is, is that these contracts could be rolled over indefinitely; basically, rolled out into infinity, is that what you're indicating.
> A: Yes.

(*Fergus, id*.; *Vergote, id*.).

The Farmers also allege that Peters assured them that they would not be held accountable for the contracts if the terms became unfavorable to the Farmers. (*Fergus, id*.; *Vergote, id*.).

Notwithstanding that Mr. Peters' testimony comes from a separate state-court case, the Farmers fail to specify the who, what, where, when, or even *if* Peters voiced his understanding of the rolling provisions to the Farmers in these cases and related to these specific contracts. Black letter law in this Circuit states that, "when a written instrument contradicts allegations in the complaint to which [the written instrument] is attached, the exhibit trumps the allegations." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (citations omitted).

Under this rule, I can consider the written instruments attached to Luckey's complaint, which are the contracts themselves. But I am not permitted or required to credit other allegations in the pleadings that contradict the plain language of the contracts, such as Peters' testimony.

Here, the plain language of the Accumulator Contracts eclipse the Farmers' allegations that the rollover provisions were infinite. Nothing in the contracts create an infinite timeline. The contracts contain a start date and an end date.

For example, Ida and Fergus' contract 11111 contains a start date of June 1, 2020 and an end date of November 26, 2021. (*Fergus*, Doc. 1-1 PageID. 20).

16

After Luckey acquired the contract, Luckey provided Fergus with written confirmation that included the quantity of undelivered bushels (20,654.08), the Delivery Period ("from 12/01/21 to 2/28/23"), and the applicable roll dates ("2/16/22 Roll to May '22, 4/25/22 Roll to July '22, 6/28/22 Roll to Dec '22, 11/30/22 Roll to March 23"). (*Id.*).

Moreover, the contracts were not, in fact, infinite. If they were, then the delivery dates would not have come due and Luckey would not have filed the lawsuit against the Farmers in the first place.

As to the allegation that Peters may have assured the Farmers behind the scenes that they would not be held to the terms of the contract, both the integration clause, discussed above, and representations and warranties provision, below, undermine their position:

> Buyer and seller each represent and warrant to the other as of the date of the Contract, and every delivery hereunder, that each has entered into the Contract as principal acting for its own account (and not as advisor, agent, broker or in any other capacity, fiduciary or otherwise), with a full understanding of, and ability to assume, the material terms and risks of the same, and has made its trading and investment decisions (including regarding the suitability thereof) based upon its own judgment and any advice from such advisors as it has deemed necessary, free from any assurances or guarantees not expressly set forth herein, and not in reliance upon any representations of the other party other than those expressly set forth herein.

(*Fergus*, Doc. 1-1, PageID. 17; *Vergote*, Doc. 1-1, PageID. 25).

Even if infinite rolling were imaginable, it was in fact illusory. What happened here makes that clear.

For all of these reasons, I find that the Accumulator Contracts in this case are Cash Forward contracts exempt from the Act. That some of the contracts were rolled forward does not change this outcome.

### e.  *Dzurka Bros., LLC v. Luckey Farmers, Inc.*, No. 23-cv-11038

On January 25, 2024, the Farmers filed a joint notice calling my attention to *Dzurka Bros., LLC v. Luckey Farmers, Inc.*, No. 23-cv-11038, 2024 WL 268140 at *6 (E. D. Mich. Jan. 24, 2024) (Ludington, J.) ("*E.D. Mich. Dzurka*").  (*Fergus*, Doc. 31; *Vergote*, Doc. 27).  In *E.D. Mich. Dzurka*, Judge Thomas J. Ludington of the Eastern District of Michigan dismissed claims that are similar to those the Farmers make here.[5]

My conclusion differs from Judge Ludington's finding in *E.D. Mich. Dzurka* that, at least at the pleading stage, the Farmers had set forth enough allegations in the complaint that the rolling feature could have been infinite. *E.D. Mich. Dzurka*, *supra*, 2024 WL 268140 at *9-10. For the reasons stated above, I respectfully disagree with my colleague's conclusion.

In support of his ruling, Judge Ludington favorably cited *Eby v. Producers Co-Op, Inc.*, 959 F. Supp. 428, 433 (W.D. Mich. 1997). In *Eby*, the district court found that the plaintiff farmers' allegations in the complaint—that the defendant elevator could roll the contracts infinitely—was enough to overcome a 12(b)(6) motion to dismiss. The *Eby* case is from 1997; long before the Supreme Court clarified the pleading standards in *Twombly/Iqbal*. In light of *Twombly/Iqbal*, I find that the allegations in the Farmers' claims here are not enough to proceed, even though similar allegations may have survived in *Eby*. Particularly where, as here, the Farmers' allegations contradict the plain language of the contracts themselves, I need not credit the bare allegations.

Though this is dicta, I find that even if the contracts fell under the Act, then the claims should nonetheless be dismissed for the same reasons explained by Judge Ludington. *E.D. Mich. Dzurka*, *supra*, 2024 WL 268140 at *11–15.

---

[5] Indeed, a side-by-side comparison of the farmers' complaints in the *E.D. Mich. Dzurka* case and the Farmers' pleadings here demonstrates they are nearly identical in all material regards.

Notably, some of the farmers in Judge Ludington's case appear to include some of the Farmers in the cases brought in this district court.

Specifically, I would dismiss Count 1, "Fraud by Misrepresentation or Omission of Material Facts in Connection with Solicitation, Maintenance or Execution of Commodities Futures Transactions," for the Farmers' failure to plead such claim with particularity, as required by Federal Rule of Civil Procedure 9(b). *See id.*, at * 11.

As aptly explained by Judge Ludington, the Farmers' claim for fraud "does not identify what these representations were; nor does it explain how [the farmers] were induced beyond conclusory claims." *Id*. Nor do the Farmers plead their fraud by omission with particularity, as required by Rule 9(b). *See id.* at *12.

I would dismiss Count 2, "Unlawful Engagement in Illegal Off-Exchange Fictitious Sales of Grain" also for the same reasons as Judge Ludington. As he stated:

> the facts in [the farmers' claim]—even when assumed true—do not demonstrate that Defendants effectuated the Grain Contracts with the intent to avoid taking a genuine position in the market; nor that the Grain Contracts merely had the *appearance* of being subject to the open futures market but, in reality, worked to protect Defendants from market risk.

*Id*. at * 12. On this same basis, I would dismiss Count 2.

I would dismiss Count 3, "Fraud by a Commodities Trade Advisor Employing a Device, Scheme or Artifice or In the Course of a Transaction, Practice or Course of Business" for the same reasons as Judge Ludington. As he stated, "[the farmers] have not sufficiently pleaded that Section 4m's CTA registration requirement applied to [Ida and Luckey], and have not pleaded fraud under Section 4o with particularity." *Id*. at *14. I agree and would dismiss Count 3 on this basis.

In sum, even if I had not dismissed the federal claims because the contracts are not futures contracts subject to the Act, I would dismiss them in any event.

**2. State Law Claims**

The Farmers' remaining counts against the Grain Elevators are all state-law claims. (*Fergus*, Doc. 4, PageID. 104–110; *Vergote*, Doc. 3, PageID. 121–127). The parties do not dispute that Michigan law applies to these claims. (*Fergus, id*.; *Vergote, id*.).

Since I have dismissed the federal claims, the only basis for my jurisdiction over the Farmers' state-law claims is supplemental jurisdiction under 28 U.S.C. § 1367(c). "[S]upplemental jurisdiction is discretionary, not mandatory." *Charvat v. NMP, LLC*, 656 F.3d 440, 446 (6th Cir. 2011). I decline to exercise supplemental jurisdiction over the state law claims and I express no opinion on their merit under Rule 12(b)(6).

**Conclusion**

Accordingly, and for the reasons set forth above, I grant the Grain Elevators' motions to dismiss. I find that the Accumulator Contracts are not futures contracts. They are therefore exempt from the Act.

I also find that, even if they were not exempt, these three counts should be dismissed for failing to state plausible claims under *Twombly*/*Iqbal*.

I decline to exercise supplemental jurisdiction over Fergus' and Vergote's state-law claims.

Because I no longer have jurisdiction over these cases, I remand them to the Court of Common Pleas in Sandusky County, Ohio, where Luckey originally filed the lawsuits, for all further proceedings.

It is, therefore, ORDERED THAT:

1. The Defendants' motions (*Fergus*, Docs. 13, 28; *Vergote*, Docs. 9, 24) be, and the same hereby, are granted;

2. The cases be, and hereby are, dismissed;

20

3. The cases be, and hereby are, remanded to the Sandusky County, Ohio, Court of Common Pleas for all further proceedings.

SO ORDERED.

<em>/s/ James G. Carr</em>

Sr. U.S. District Judge